**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

WSRE-TV FOUNDATION, INC.,
A Florida non-profit corporation,

      Plaintiff,

      v.                                  Case No. 4:25-CV-503

LAURA BARBER, an individual,
GREG PADILLA, an individual, and
MARY LISA GREDLER, an individual,

      Proposed Donor Class
      Representative Defendants,

And

THE DISTRICT BOARD OF
TRUSTEES FOR PENSACOLA
STATE COLLEGE, a Public University,
and COMMISSIONER ANASTASIOS
KAMOUTSAS, as Commissioner of
Florida Department of Education,

      Defendants.

_____/

**<u>COMPLAINT</u>**

COMES NOW, WSRE-TV FOUNDATION, INC. ("Foundation" or

"Plaintiff"), by and through its undersigned counsel, and brings this

Complaint alleging federal statutory interpleader, violations of Plaintiff

Foundation's First Amendment rights under the Federal Constitution, pursuant to 42 U.S.C. § 1983, and other claims against THE DISTRICT BOARD OF TRUSTEES FOR PENSACOLA STATE COLLEGE ("PSC" or "DEFENDANT"), and ANASTASIOS KAMOUTSAS, as Commissioner of Florida Department of Education ("Kamoutsas", "Department" or "Defendant") (collectively "DEFENDANTS"), and as to the rights of the proposed Defendant Donor Class, represented by DONOR CLASS REPRESENTATIVES LAURA BARBER, GREG PADILLA and MARY LISA GREDLER, and DONOR DEFENDANT CLASS ("DONOR DEFENDANTS"), and states the following:

## STATEMENT OF THE CASE

*"It's easy to say, 'It's not my child, not my community, not my world, not my problem.' Then there are those who see the need and respond.  I consider those people my heroes."*

- Fred Rogers, *You Are Special: Words of Wisdom for All Ages from a Beloved Neighbor* (Penguin Books 1995).

1.      In a modern age where noise masquerading as knowledge is spread by Tik-Toks, Snaps, and Shorts, private citizen-heroes across Northwest Florida and South Alabama saw a need for mass media to serve the public with educational television, free of commercialization and government control. In reliance on private financial support from these

citizens, that need has been met with the programming provided by the Public Broadcasting Service ("PBS"), including its documentaries and Emmy-award winning children's shows such as *Sesame Street* and *Mister Rogers' Neighborhood*, combined with unique programming to cater to the local community.  Citizen-heroes responded by donating millions of dollars in private funds to the Foundation to ensure the continued availability of public television to children and adults across the region.

2.    The sacrifice of these donors is now threatened by the decision of Pensacola State College ("PSC"), which is acting at the directive of the State of Florida and its Department of Education ("Department"), to sever the relationship between the Foundation, its donors, and PBS.  PSC's misguided interpretation of the legal implications of its actions not only risks depriving the community of public television, which has benefited generations, but also threatens millions of dollars in private donations to the Foundation.  If PSC is allowed to access these funds, as it seeks to do, PSC will chill the constitutionally protected expression of the Foundation and its donors and use the money as PSC chooses, rather than as intended by the donors who entrusted the Foundation to further the mission and goals embodied by public television.

3.      As a result of PSC's and the Department's decision to terminate PSC's relationship with the Foundation and to undermine the previously shared goals of providing public television, the Foundation brings this action to protect these private funds, to protect the Foundation's and its donors' First Amendment rights of free speech and association, and to obtain declaratory relief from the Court in order to ensure that the funds are administered consistently with the intent of the private donors.  As intended by those donors, the Foundation, in its capacity as a private not-for-profit entity, seeks to use the funds to continue the mission embodied by public television. However, as PSC has taken the position that the Foundation should effectively dissolve and disburse its funds to PSC, if necessary, the Foundation asks the Court to provide notice to a Donor Class, represented by named putative class representatives, to be heard as to how the funds should be administered going forward.  Such relief is necessary to prevent the Foundation from being subject to competing claims and civil actions related to the funds in the Foundation's control.

## JURISDICTION AND VENUE

4.      Plaintiff WSRE-TV Foundation Inc. is a non-profit corporation incorporated under the laws of Florida with principal offices in Pensacola, Florida.

5.    Proposed Representative of the Defendant Donor Class Laura Barber is an individual who resides in Gulf Breeze, Florida, is a citizen of Florida, and has donated funds to the Foundation, which are at issue.

6.    Proposed Representative of the Defendant Donor Class Greg Padilla is an individual who resides in Mobile, Alabama, is a citizen of Alabama, and has donated funds to the Foundation, which are at issue.

7.    Proposed Representative of the Defendant Donor Class Mary Lisa Gredler is an individual who resides in Tallahassee, Florida, is a citizen of Florida, and has donated funds to the Foundation, which are at issue.

8.    Defendant Donor Class consists of over 100 private individuals that have donated funds to the Foundation, which are at issue, and which may have claims to such funds or a right to direct the use of such funds. The proposed class is being named because the class is so numerous that joinder of all members is impracticable, there are questions of common law or fact to the class, the factual and legal position of the representative Donor Defendants are typical of the factual and legal positions of the class, and the representative Donor Defendants will fairly and adequately protect the interest of the class.

9.      Defendant Donor Class is also necessary because:

a.  Prosecuting separate actions against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct;

b.  Adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

c.  The final declaratory relief is appropriate respecting the class as a whole; and/or

d.  The questions or law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other methods for fairly and efficiently adjudicating the controversy.

10.    Defendant PSC is the Board of Trustees for Pensacola State College, a public university located in Escambia County, Florida, which asserts a claim to the private donations held by the Foundation, which are at issue.

11.    Defendant Anastasios Kamoutsas is being named in his capacity as commissioner of the Florida Department of Education, which is headquartered in Tallahassee, Florida.  The Department oversees Florida state colleges, including Defendant PSC.

12.    This Court has jurisdiction over Plaintiff Foundation's federal claims under 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983, 1988.

13.    Jurisdiction is further proper under 28 U.S.C § 1367, 28 U.S.C § 1332 and 28 U.S.C. § 1335 (Federal Interpleader), as there is the requisite minimal diversity jurisdiction between Plaintiff and Donor Defendant, Greg Padilla, and the amount in controversy meets the threshold dollar requirements of over $500 (28 U.S.C § 1335), over $75,000 (28 USC § 1332(a)) and over $5,000,000 (28 U.S.C. § 1332(d)(2)), respectively.

14.    Venue is proper under 28 U.S.C § 1391(b) in this District because Defendant Department is located in and acted in this venue, and the causes of action alleged arose, in part, from donations and actions by Defendants that occurred in this District, including donations made by Defendant Donor Mary Lisa Gredler as a resident in Leon County, Florida. The action is properly in the Tallahassee Division of the United States District Court for the Northern District of Florida pursuant to N.D. Fla. Loc. R. 3.1(A)(2) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### I.    The Creation and Expansion of the Public Broadcasting Service

15.    Over 100 years ago, at the dawn of the mass communications age introduced by radio, there was spirited disagreement about how to use mass media technology to serve the public interest.

16.    Advocates for educational radio attempted to set aside radio frequencies for educational use. However, the Radio Act of 1927 and the Communications Act of 1934 created an almost entirely commercialized industry, oriented towards delivering audiences to advertisers. Educational radio stations, many based within universities, operated on the margins, using low power frequencies with limited capacity. In 1938, educational advocates were able to set aside radio channels for educational use.

17.    In 1939, Americans were first introduced to television. Again, there was spirited disagreement as how to best use this form of mass media to serve the American public. This debate continued until 1952, when the federal government set aside a part of the broadcast television spectrum for educational purposes.

18.    By 1956, there were 16 educational television stations; and by 1962, there were 76 such stations across the country. These early

educational television stations were extremely local and reflected the unique needs and interests of the communities in which they served.

19.    Some states opted to create state-wide networks, while other stations grew out of local community non-profits or educational institutions. These early stations were extremely independent and relied almost entirely on their own communities for funding and programming.

20.    In the mid-1960's, leaders of educational television stations recognized the need for collaboration to ensure the continued financial success of public educational television.

21.    With the endorsement of the White House, the Carnegie Commission on Educational Television produced a report in 1967. The report emphasized the importance of local stations and proposed new ways to fund the work of public television stations, while maintaining their independence from government. The Commission captured the lofty aspirations for public television as follows:

> [Public television] should arouse our dreams, satisfy our hunger for beauty, take us on journeys, enable us to participate in events, present great drama and music, explore the sea and the woods and the hills.  It should be our Lyceum, our Chautauqua, our Minskey's, our Camelot.

Carnegie Commission on the Future of Public Broadcasting, *Public Television: A Program for Action*, January 26, 1967.

22.　In 1967, Congress enacted the Public Broadcasting Act and paved the way for the formation of the federal Corporation for Public Broadcasting ("CPB").

23.　CPB quickly recommended the formation of a national program distribution service, which was organized to provide national interconnection services for its station members.

24.　On November 3, 1969, the Public Broadcasting Service ("PBS") was established as a successor to the National Educational Television Network.

25.　PBS began operations on October 5, 1970, and quickly became known for its high-quality programming, including iconic shows like *Sesame Street* and *Mister Rogers' Neighborhood*.

26.　Since its inception, PBS has been instrumental in providing educational content, particularly for children, and has offered a variety of documentaries, science programs, and cultural and artistic content.

27.　To create and air this content, PBS relies on a combination of federal funding, viewer donations, and grants from private foundations.

28.　Throughout its time, PBS has faced many threats to its funding, but it has continued to adapt and thrive, expanding its reach and

programming. Such success is largely reliant on private donations and fundraising, such as that by the Foundation.

29.    Over the last five decades, PBS and its 360 member stations, including WSRE-TV in Pensacola, have continued to evolve to service the American people and their local communities.

30.    From science and natural history programs, to arts and education for kids, PBS has served the needs of its citizens, not consumers, across its platforms.

31.    PBS' service remains rooted in local communities; and for many, PBS stations are the only locally operated and locally accountable media organizations that remain.

32.    For this reason, the Foundation works diligently to develop the support of private donors, who voluntarily donate small and large dollars entrusted to the Foundation to ensure that PBS programming and similar community services remain accessible to everyone in Northwest Florida and South Alabama.

## II.    History of WSRE-TV

33.    WSRE-TV, the public television station for Northwest Florida and South Alabama, began operations in 1967 under a Federal Communications

Commission ("FCC") license, which was originally granted to the Escambia County School Board, and is reliant on private fundraising to operate.

34.    The federal broadcasting license granted to WSRE-TV is overseen by the FCC, which regulates the public broadcast spectrum and issues specific licenses to broadcast at certain frequencies, subject to specific federal requirements. The FCC's regulations ensure that broadcast stations operate in the public interest and comply with various rules and regulations, particularly as it relates to public, educational television programming. In operating under this license, stations agree to federal oversight of the FCC and to follow the FCC's rules and regulations to ensure the stations meet their non-commercial status and serve the public interest.

35.    In 1972, the Escambia County School Board transferred the station's FCC license to the District Board of Trustees of Pensacola State College, which owned the station's analog transmitting site.

36.    In reliance on PBS and the Foundation, WSRE-TV met its obligations under its FCC license by offering educational and formal training content throughout the decades, from *Sesame Street* to educational programming related to naval warships for students in the military during the Vietnam War and educational programming for nursing students.

37.    Currently, WSRE-TV reaches more than 1.2 million viewers from the Alabama-Mississippi line to Sandestin, Florida, as broadcast from the Jean and Paul Amos Performance Studio.

38.    WSRE-TV offers Emmy-winning PBS programming for all ages. Children's programming airs 51 hours per week on WSRE and 24/7 on the WSRE PBS Kids Channel.

39.    Since 2008, WSRE has won four regional Emmy nominations and 24 Telly Awards for original productions.

40.    WSRE produced outstanding, award-winning documentaries including *Gulf Coast War Memories, Khaki Coast, Gulf Island National Seashore, History of Baseball in Pensacola, They were our Fathers*, and *Hank Locklin: Country Music's Timeless Tenor*.

41.    WSRE-TV's robust local line-up includes *Beyond the Menu, Conversations with Jeff Weeks, In Your Own Backyard, inStudio, Connecting the Community,* and *Nightmare Theatre*.

42.    WSRE-TV's educational services positively impact local families by delivering America's #1 media brand for children through free broadcast and streaming content, classroom resources and teacher training for local schools, the operation of two WSRE Imagination Station early learning activity centers, and special community events.

43.    Financial support is vital to the services offered by WSRE-TV. WSRE's annual budget is over $4 million, which is funded in large part by the Foundation's funds received from private donors.

## III. Creation of WSRE-TV Foundation and its Direct Support Agreement with Defendant PSC

44.    To aid in raising private funds and to assist in furthering the mission of free public television, the Foundation was created in 1990.

45.    The Foundation assists in raising money for a multi-faceted mission, which includes but is not limited to ensuring the broadcast of PBS in Northwest Florida and South Alabama.

### A. Private Fundraising

46.    The Foundation, and its Board, engage in continuous and systematic fundraising campaigns to support the Foundation's mission.

47.    The Foundation's fundraising efforts include, but are not limited to, telethons, direct solicitation, on-air solicitations, and private donor fundraising events.

48.    The overarching purpose promoted by the Foundation in soliciting private donations is to ensure the continued availability of PBS programming, which has become integrated into American life and society unlike any other phenomenon over the last half-century.

49.    Since its inception, the Foundation has procured over $26 million in private donations to support the Foundation's mission, with average annual donations of over $800,000 for the past five years.

50.    At present, the Foundation is responsible for administering over $5 million to support its mission.

### B. Gift Agreement of Jean and Paul Amos

51.    In 2006, Jean and Paul Amos provided a gift endowment to the Foundation of over $500,000.

52.    This private gift was intended to be a permanent endowment fund with distributions to be made only from income, unless the Foundation Board chooses otherwise.

53.    The intention of the Amos' endowment was that it be used only in accordance with the mission and scope of the Foundation and for educational purposes.

54.    At present, the Amos' endowment, including principal and associated growth, is valued at over $1.5 million.

55.    When necessary, at the Foundation's direction, the gift endowment can be modified and provided to another charity or used consistently with other charitable and/or educational needs supported by the Foundation.

## C. Direct Support Organization Agreement

56.    On November 17, 2016, the Foundation and Defendant PSC entered into a Direct Support Organization ("DSO") Agreement.  *See* **Exhibit 1**, DSO Agreement.

57.    In this Agreement, the Foundation agreed to receive, hold, invest and administer property and to make expenditures to, or for the benefit of, a Florida College System institution so long as the Agreement continued.

58.    Specifically, the Foundation was responsible for:

   a.  "[T]he control and management of the Foundation's assets…***and shall also be responsible for the prudent management of all gifts consistent with donor intent***…"

   b.  "[T]he performance and oversight of the Foundation's operations, based on bylaws that clearly address the Board's responsibilities and expectations regarding conflict of interests."

   c.  Allow a "designee" from Defendant PSC to serve on Plaintiff's board.

   d.  To be "responsible for all activities related to soliciting private support, establishing productive relationships with external groups, reporting of gifts and Foundation development."

   e.  "[B]ear[ing] the major responsibility for private sector fundraising."

*Id.* at Section III (emphasis added).

59.    The DSO Agreement recognized the Foundation's employees to be full-time and regular employees of Defendant PSC, who were entitled to

participate in the retirement system and other fringe benefits of the college

so long as the DSO Agreement was in place.  *Id.* at Section IV.

60.    The Agreement further recognized:

> ***"[PSC] and [the Foundation] are separate and distinct legal entities, and nothing in this agreement is intended to create or constitute a joint venture, partnership, agency, trust, or other association of any kind between the parties or persons referred to herein.*** Except as otherwise provided herein, ***no party shall have any right, power, or authority to create any obligation, express or implied, on behalf of any other party***…In all matters relating to this agreement each party hereto shall have sole liability for its own acts."

*Id.* (emphasis added).

61.    By providing this language in the Agreement, which was drafted

and executed by Defendant PSC, Defendant PSC recognizes that both

entities are separate and apart from one another and thereby should also

recognize that the Foundation's assets, including the funds at issue in this

lawsuit, are separate and apart from PSC's assets and therefore not under

PSC's control.

62.    The DSO Agreement recognized that the Foundation is "the

primary depository of private gifts." *Id.* at Section VI.

63.    The DSO Agreement provided that Defendant PSC could

decertify and terminate this Agreement, if Defendant's President determines

the Foundation is no longer operating for the benefit of Defendant PSC, the

tax-exempt status of the Foundation was revoked, or the Foundation failed

to materially comply with applicable laws, rules or the DSO Agreement. *Id.* at VIII.

### D. PSC Terminates its Relationship with PBS and Decertifies the Foundation as a DSO

64.    Despite the long history of public broadcasting television in Florida, the State of Florida has taken actions in Tallahassee, Florida, to undermine public broadcasting, including attempts to interfere with funding, such as that provided by the Foundation and its donors.

65.    Notwithstanding local public media groups attempting to have a dialogue with the Governor's Office and the Florida Department of Education to determine if there is a way to address the Governor's concerns regarding public broadcasting, while ensuring Floridians can continue to have access to the programming they turn to for information about their state government, and the resources they depend on during a storm, the funding cuts were upheld and the directive by the state government and Department was that PBS was "Done in Florida." *See* X, Formerly Twitter, @GovRonDeSantis, dated July 11, 2025.

66.    In September 2025, PSC voted to end PSC's affiliation with PBS as of June 30, 2026, and then decided to de-certify PSC's DSO Agreement with the Foundation.

67.    On September 25, 2025, Defendant PSC's President, Ed Meadows, sent a letter to the Foundation confirming that Defendant PSC was "formal[ly] terminat[ing]…WSRE Foundation as a direct support organization of Pensacola State College, effective upon receipt of this letter dated September 25, 2025."  *See* **Exhibit 2**, September 25, 2025 Letter to Plaintiff.

68.    However, PSC's actions went beyond merely ending its affiliation with the Foundation and PBS.  President Meadows also purported to require the dissolution of the pre-existing private Foundation and went even further to demand that the funds donated to the Foundation by private citizens be turned over to the government entity, PSC.  PSC also accessed and took control of the Foundation's confidential files and records that disclose the identifying and personal information of the Foundation's donors.

69.    PSC, and its government employees and agents, have engaged in direct and overt acts to misappropriate and/or interfere with the Foundation's private funds and donors, without notice or authority from the Foundation or the private citizen donors. These acts include but are not limited to attempting to access the Foundation's bank account and attempting to intercept checks from private citizens intended to be donations

to the Foundation, as well as appropriating the donor database and personal identification information related to the Foundation's donors.

70.    There is no legal basis for the demands made by President Meadows and PSC.  First, no government entity, much less Pensacola State College, can unilaterally demand the dissolution of a private Foundation. Second, even if the Foundation were dissolved, which it does not intend to do, its bylaws specifically provide that, should there be a dissolution, the distribution of assets may be given to an organization exempt under Section 501(c)(3) of the Internal Revenue Code, as the Board of Directors, or the court, respectively, may determine.  *See* **Exhibit 3**, Plaintiff's Bylaws. The government cannot unilaterally seize these funds as PSC has attempted to do. PSC disagrees.

71.    As evidenced by public statements from officials for the State of Florida, these impermissible actions by the government are because of the Foundation's intent to continue to promote PBS programming content and are intended to chill such speech and the association of the Foundation's donors in support of such speech.

72.    Given that PSC, at the direction of the Department, has chosen to abandon its relationship with PBS, the Foundation does not believe it is

required to continue to provide funding to PSC, which will not be in furtherance of the Foundation's mission or its donors' intent.

## IV.    Foundation's Continued Mission and Intent

*"Often when you think you're at the end of something, you're at the beginning of something else."*

> - Fred Rogers*, The World According to Mister Rogers: Important Things to Remember,* (Hyperion Books 2003).

73.    The Foundation's mission is to serve the local communities of Northwest Florida and South Alabama with high-quality programming, training, events, and services that educate, entertain, inspire, and support the needs of the local community.

74.    While PSC has chosen to no longer pursue this mission, the Foundation is committed to continuing its mission and ensuring that PBS programming remains within reach of every child and resident of Northwest Florida and South Alabama.

75.    The Foundation's private donors intended to entrust their private funds with the Foundation for the purpose of using the funds to further that mission, which includes distribution of PBS in the local area.

76.    To this end, the Foundation believes it is entitled to retain and spend the funds in its possession, as well as future donations to the

Foundation, as its Board of Directors directs, including in broadcasting PBS content.

77.    The Foundation is actively pursuing means that would allow the Foundation to take over and directly broadcast PBS programming, as well as continuing to support the other community events that further the Foundation's mission and donor intent.

78.    In the event this Court finds, however, that the Foundation may not continue, the Foundation asks the Court to provide notice to and allow a proposed Defendant Class of Donors, and/or sub-classes, to be heard as to the distribution of these private funds consistent with donor intent, which may include return of funds to donors and/or distribution to other causes.

79.    The Foundation has offered to resolve the issues identified herein with PSC in a manner that would allow the Foundation to continue its mission consistent with donor intent to make public television, including PBS programming, available in the community.  However, PSC refused these overtures and continues to demand the Foundation forfeit its funds to PSC and/or to the PSC Foundation.[1]    Specifically, PSC has demanded: (a)

---

[1] There is no distinction of transferring the funds in question to PSC or to the PSC Foundation, as the sole focus of both entities is promoting the state college of PSC.  Further, Defendant PSC has stated that neither entity would use the funds for the original donor purposes of promoting, continuing, and maintaining access to PBS for Northwest Florida and South Alabama.

Plaintiff Foundation pay all outstanding invoices related to WSRE-TV, including invoices for services and/or goods after the cancellation by PSC of the DSO Agreement; (b) Plaintiff Foundation transfer the Amos Endowment, meant for the support of providing PBS broadcasting to the local community, to PSC; and (c) all of Plaintiff Foundation's funds, including funds donated by donors for the continuation and support of PBS broadcasting, be transferred to PSC. Further, Defendant PSC objected to Plaintiff Foundation's desire to broadcast PBS to the local area. Defendant PSC threatened adverse action by the State of Florida, as well as legal action, if Plaintiff Foundation continued to pursue the Foundation's mission and did not meet PSC's demands.  As such, Plaintiff Foundation has no choice but to bring this action to have the Court determine the rights of all parties involved.

## COUNT I – FEDERAL INTERPLEADER
## UNDER 28 U.S.C § 1335

80.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as if fully set forth herein.

81.    Plaintiff is in possession of donations provided by private Donors to be used for maintenance and continuance of free public educational television and community events.

82.    Defendant PSC has terminated its relationship with the Foundation and educational television programming from PBS, which is contrary to the intent of the donors.

83.    Defendant PSC has sought for the Foundation to dissolve and for the Foundation to transfer its assets to Defendant PSC.

84.    Given that this position of PSC is inconsistent with donor intent and the Foundation's bylaws, Plaintiff Foundation is exposed to potential double liability and litigation by Defendant PSC, the Department, Defendant Donors, and/or Plaintiff Foundation's board members if the Foundation turns over the requested private assets to Defendant PSC.

85.    Plaintiff seeks to interplead the funds into the Court Registry by providing a bond payable to the Clerk in the amount set by the Court and which is conditioned upon compliance by the Plaintiff with the future order or judgment of the Court with respect to the full assets.

WHEREFORE, Plaintiff requests it be allowed to interplead the funds under Federal Interpleader, 28 U.S.C. § 1335, the Defendants be refrained from instituting or prosecuting any separate action against the Plaintiff for recovery of the funds or any part of it in any other proceeding, the Court determine the proper distribution of the funds, Plaintiff recovers reasonable

attorney's fees and costs, and for any further relief that this Court deems just and proper.

## COUNT II – VIOLATION OF FIRST AMENDMENT RIGHTS TO FREE SPEECH AND FREEDOM OF ASSOCIATION UNDER 42 U.S.C. § 1983

86.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as if fully set forth herein.

87.    Defendants PSC and the Department acted under color of law, but contrary to law, and intentionally and unreasonably deprived Plaintiff Foundation and its donors of their rights, privileges, and immunities secured by the First Amendment, including freedom of speech and freedom of association, under the Federal Constitution and the laws of the United States, including 42 U.S.C § 1983.

88.    The donations made by private citizens to the Foundation and the Foundation's decisions related to spending that money, which is done in support of public television and programming provided by PBS, constitute speech protected by the First Amendment.

89.    Further, the identity and personal information of the Foundation's donors, which are maintained by the Foundation, are protected from disclosure to, or possession by, the government as part of the freedom of association enshrined in the First Amendment.

90.    To chill such speech and infringe on the right of association, PSC and the Department have taken adverse action against the Foundation, and derivatively its donors, based on the content of the Foundation's speech, including but not limited to the association of that speech with public television programming from PBS.

91.    These efforts to chill protected speech and to engage in materially adverse action include, but are not limited to: (a) demanding that the Foundation dissolve its very existence and transfer all of its assets, including private donations and the identity of its donors, to PSC; (b) taking and maintaining unauthorized possession of the Foundation's donor information, including the identities of such donors; (c) taking possession of the Foundation's assets and property without consent from the Foundation; and (d) threatening to enjoin the Foundation's use of its own assets, including spending of donations from donors.

92.    The materially adverse actions of PSC and the Department, as alleged herein, occurred because of the Foundation's and donors' protected speech and association, particularly related to making PBS programming and content available in the local community.

93.    As demonstrated by statements from government officials, the content of this speech related to PBS programming was, and remains, a

motivating factor for these adverse actions, notwithstanding pretextual explanations that may be offered by PSC and the Department. To the extent PSC's actions were motivated by financial or other non-content based factors, the mere termination of the DSO Agreement and termination of PSC's affiliation with PBS and the Foundation would have addressed those pretextual concerns. The *additional* actions and demands of PSC and the Department to prevent the Foundation and its donors from continuing to support PBS programming, however, constitute violations of the First Amendment.

WHEREFORE, Plaintiff Foundation demands judgment against Defendants PSC and the Department for damages, as well as injunctive relief to enjoin PSC, the Department, and their employees, agents, and officials from violating Plaintiff Foundation's and its donors' First Amendment rights to freedom of speech and freedom of association, for recovery of costs and reasonable attorney's fees under 42 U.S.C. § 1988, and for any further relief that this Court deems just and proper.

## COUNT III – DECLARATORY ACTION
## CONTINUATION OF PLAINTIFF FOUNDATION

94.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as if fully set forth herein.

95.   There is doubt and uncertainty with respect to the continuation of the Foundation and its continued maintenance, collection, and use of funds, and the Foundation is entitled to have that doubt removed. Indeed, the Foundation believes it should continue as a private non-profit, which it did for 26 years before the DSO Agreement with Defendant PSC.

96.   PSC has asserted that the Foundation should dissolve and turn over its assets to PSC, based on decertification of the DSO Agreement.

97.   The Foundation is asking the Court to declare its legal right to continue as a private non-profit organization and allow it to continue its maintenance, collection, disbursement, and use of its funds, as its Board of Directors instructs to support PBS and its mission, rather than requiring the Foundation to dissolve and transfer its assets to Defendant PSC.

98.   There is a bona fide, actual, present, practical need for declaratory relief.

99.   The declaration pertains to a present controversy as to the state of facts as alleged herein.

100.   The privileges and powers of the Foundation with regard to its continuation and use and maintenance of funds are at issue.

101. The parties have actual, present, adverse, and antagonistic interests with respect to the Foundation's continuation as an entity and the disbursement and maintenance of the funds at issue.

102. The antagonistic and adverse interests are all before the Court by proper process.

103. The relief sought herein is not merely the giving of legal advice or the answer to questions propounded by curiosity.

WHEREFORE, Plaintiff respectfully requests a declaratory judgment that declares that the Foundation can continue as a private non-profit to continue its mission and the mission of PBS, that the Foundation can continue to collect, maintain, and disburse its funds as directed by its Board to continue furthering its mission, the Foundation's funds do not have to be transferred to Defendant PSC, for attorney's fees and costs, and for any other relief as the Court deems just and proper.

## COUNT IV – DECLARATORY ACTION
## DISBURSEMENT OF FUNDS

104. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as if fully set forth herein.

105. If the Court determines the Foundation must be dissolved and/or distribute its assets because of the decertification of the DSO Agreement by PSC, there is doubt and uncertainty with respect to the disbursement of the

Foundation's assets (which include donations from Defendant Donor Class and the Jean and Paul Amos Endowment), and the parties are entitled to have that doubt removed.

106.  PSC has asserted that any such funds should be turned over to PSC.

107.  In the event disbursement is required, the Foundation asks the Court to recognize the Defendant Donor Class and allow it to be heard, through its representatives, to guide disbursement of the funds consistent with donor intent.

108.  There is a bona fide, actual, present, practical need for declaratory relief.

109.  The declaration pertains to a present controversy as to the state of facts as alleged herein.

110.   The privileges and powers of the Foundation with regard to the disbursement of its funds, if required by this Court to dissolve, are at issue.

111.  The parties have actual, present, adverse, and antagonistic interests with respect to the Foundation's disbursement and maintenance of the funds in the event of dissolution.

112.  The antagonistic and adverse interests are all before the Court by proper process.

113.  The relief sought herein is not merely the giving of legal advice or the answer to questions propounded by curiosity.

WHEREFORE, Plaintiff respectfully requests a declaratory judgment as to the distribution of assets, including donations from the donor class, for attorney's fees and costs, and for any other relief as the Court deems just and proper.

## COUNT V – DECLARATORY RELIEF
## DONATION TO NON-PROFITS

114.  Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as if fully set forth herein.

115.  If the Foundation is required to dissolve and cannot return the funds to Defendant Donor Class and/or distribute based on donor intent, then there is doubt and uncertainty with respect to the handling and disbursement of the funds at issue, and Plaintiff is entitled to have that doubt removed.

116.  If dissolution is necessary and the Foundation cannot return funds to donors and/or distribute based on donor intent, then the Foundation Board should be permitted to distribute the funds consistent with the Foundation's mission, which may include distributions or donations to non-profits and/or charitable organizations that support the Foundation's mission.

117.  PSC has asserted that such funds should be turned over to PSC.

118.   As such, there is a bona fide, actual, present, practical need for declaratory relief.

119.   The declaration pertains to a present controversy as to the state of facts as alleged herein.

120.   The privileges and powers of Plaintiff with regard to the disbursement of these funds in accordance with donor's intent and Plaintiff's bylaws are dependent upon the law applicable to the facts alleged herein.

121.   The parties have actual, present, adverse, and antagonistic interests with respect to the disbursement of the funds at issue.

122.   The antagonistic and adverse interests are all before the Court by proper process.

123.   The relief sought herein is not merely the giving of legal advice or the answer to questions propounded by curiosity.

WHEREFORE, Plaintiff respectfully requests a declaratory judgment that declares that, if the Foundation's dissolution is mandated and the Foundation cannot return its funds to donors and/or distribute based on donor intent, then Plaintiff Foundation can disburse the funds to non-profit(s) and/or charitable organization of Plaintiff Foundation's choice, for attorney's fees and costs, and for any other relief as the Court deems just and proper.

## COUNT VI – DECLARATORY RELIEF
## EFFECT OF DECERTIFICATION AS DSO

124.  Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as if fully set forth herein.

125.  On or about September 25, 2025, PSC terminated its DSO Agreement with the Foundation.  The decertification of the Foundation has created doubt and uncertainty regarding continued obligations of the Foundation, if any, which had been imposed by the DSO, including but not limited to:

a.    The role (if any) of PSC in participating in the Foundation's Board of Directors;

b.    The applicability of Public Records and Sunshine Laws to the Foundation going forward;

c.    The Foundation's obligations as to agreements or contracts that were predicated on the DSO Agreement being in place; and

d.    Ownership and/or compensation for assets paid for and/or owned by the Foundation that are under the possession, control or use of PSC.

126.  The Foundation believes that, based on PSC's termination of the DSO Agreement, the Foundation:

a. Is no longer required to recognize board appointees allocated to PSC under the agreement;

b. Is no longer subject to Public Records and/or Sunshine Laws;

c. Is no longer required to participate in agreements with PSC predicated on the DSO relationship; and

d. Is entitled to a return of all property in possession of PSC owned and/or paid for by the Foundation under the DSO, or that PSC compensate the Foundation for the value of such property.

127. PSC has indicated that it disagrees, in whole or in part, with the effect of its termination of the DSO Agreement.

128. As such, there is a bona fide, actual, present, practical need for declaratory relief.

129. The declaration pertains to a present controversy as to the state of facts as alleged herein.

130. The antagonistic and adverse interests are all before the Court by proper process.

131. The relief sought herein is not merely the giving of legal advice or the answer to questions propounded by curiosity.

WHEREFORE, Plaintiff Foundation respectfully requests a declaratory

judgment that declares that it (a) is no longer required to recognize board appointees allocated to PSC under the agreement; (b) is no longer subject to Public Records and/or Sunshine Laws; (c) is no longer required to participate in agreements with PSC predicated on the DSO relationship; and (d) is entitled to a return of all property in possession of PSC owned and/or paid for by the Foundation under the DSO, or that PSC compensate the Foundation for the value of such property, for attorney's fees and costs, and for any other relief as the Court deems just and proper.

## <u>COUNT VII – EQUITABLE ACCOUNTING</u>

132.  Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 79 above, as if fully set forth herein.

133.  For decades, in reliance on the DSO relationship, the Foundation and PSC worked in tandem to support the jointly held mission of furthering public educational television and PBS programming. The parties collaborated in an informal manner to effectively and efficiently further that objective.  As a consequence, property, employees, and funds were not always clearly delineated and/or accounted for between the parties.

134.  Due to the length of and the nature of the DSO relationship, these transactions, including the invoicing and maintenance of funds by PSC were numerous, extensive, and/or complicated.

135.  As this prior DSO relationship and transactions between the parties were numerous, extensive or complicated, the right to an accounting in equity is undoubted.

136.  An accounting is required to render complete justice between the parties.

137.  Based upon the circumstances, there is no adequate remedy at law.

Wherefore, and for the foregoing reasons, Plaintiff Foundation demands an accounting from Defendant PSC and Defendant Department as to the parties relationship and the Foundation's funds and property, received and maintained by Defendant PSC, attorney's fees and costs, and for such other relief that the Court deems just and proper.

Dated this 11th day of December, 2025

Respectfully submitted,

/s/ Ben Gordon
**A. Benjamin Gordon III**
Florida Bar No. 528617
**Anne N. Izzo**
Florida Bar No. 1016166
AnchorsGordon, P.A.
2113 Lewis Turner Boulevard, Suite 100
Ft. Walton Beach, FL 32547
Telephone: (850) 863-1974
Facsimile: (850)863-1591
Email: bgordon@anchorsgordon.com
aizzo@anchorsgordon.com
mary@anchorsgordon.com

[casefile@anchorsgordon.com](mailto:casefile@anchorsgordon.com)

*Attorneys for Plaintiff Foundation*